NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-312

COMMONWEALTH

vs.

COL K. TULIEN.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury convicted the defendant of three counts of assault and battery by means of a dangerous weapon (as lesser included offenses of assault and battery by means of a dangerous weapon in violation of an abuse prevention order), six counts of violating an abuse prevention order, one count of witness intimidation, threatening to commit a crime, operating a motor vehicle while under the influence of intoxicating liquor, and reckless operation of a motor vehicle.[1]  On appeal the defendant challenges the sufficiency of the evidence underlying

---

[1] The jury acquitted the defendant of assault with intent to murder, one count of assault and battery by means of a dangerous weapon in violation of an abuse prevention order, one count of violating an abuse prevention order, stalking, and one count of witness intimidation.

his convictions of witness intimidation, violating an abuse prevention order, assault and battery by means of a dangerous weapon, and reckless operation of a motor vehicle. He also argues that his conviction of threatening to commit a crime cannot stand because the jury were not instructed on the requisite mens rea in accordance with Counterman v. Colorado, 600 U.S. 66 (2023), which was decided after trial concluded in this case. We are constrained to agree on this last point and thus vacate the conviction of threatening to commit a crime. We affirm the remaining convictions.

Background. We summarize the facts in the light most favorable to the Commonwealth, reserving certain details for later discussion. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

On February 4, 2020, the defendant's wife (wife) obtained an ex parte abuse prevention order under G. L. c. 209A against the defendant. On February 14, 2020, after a hearing at which the defendant did not appear, a District Court judge extended the ex parte order for one year.

In the early morning hours of March 18, 2020, the wife was driving home from work when a car pulled up alongside hers. The wife rolled down her window and saw that the defendant was driving the other car. The defendant said to the wife, "Today

2

is the last day for me to kill you." The wife immediately called 911 and drove away at fifty to sixty miles per hour. The defendant followed -- pursuing the wife through the towns of Randolph, Canton, and Milton -- and during his pursuit struck the wife's car with his at least three times. Eventually, the wife came upon the State Police barracks in Milton and drove toward it, honking her horn.

State Police Sergeant Kevin Murray was inside the barracks when he heard a car honking, an engine revving, and yelling from the parking lot. He went outside and saw the wife standing in front of her car, screaming and "hysterical." In a different section of the parking lot, the defendant was standing next to his car, which had front-end damage and smoke or steam coming from the engine. As soon as Sergeant Murray looked in his direction, the defendant returned to his car and drove away.

State Police Trooper Brandon Doherty was monitoring traffic nearby when Sergeant Murray notified him of the incident at the barracks. Soon thereafter, Trooper Doherty saw the defendant's car on Route 28 in Milton. It had "heavy" front-end damage, and there was steam coming from the hood. After initiating a stop and advising the defendant of his Miranda rights, Trooper Doherty asked the defendant what happened to his car. The defendant replied that he was a delivery driver and that his car

3

had been damaged while he was making a delivery. When Trooper Doherty asked whether the defendant knew that the wife had "an open restraining order" against him and whether he had made contact with her, the defendant replied that "he did know that there was a restraining order" but that he had not seen the wife that evening. Later in the conversation, however, the defendant admitted that he had seen the wife that evening, claiming that "he had accidentally run into her with his car." The defendant asked Trooper Doherty to relay an apology to the wife, but Trooper Doherty stated he "wouldn't be able to do that" because "[t]hat would be a violation of the protective order." Trooper Doherty then placed the defendant under arrest and transported him to the barracks.[2] While there, the defendant sent the wife multiple text messages stating, among other things, "You had the police arrest me again thanks" and "Tell the police to let me out."[3]

---

[2] Trooper Doherty formed the opinion that the defendant was intoxicated based on his observations at the scene and the defendant's performance on field sobriety tests administered at the barracks. The defendant also agreed to take a breath test, which showed that his blood alcohol concentration was .18. The defendant raises no argument on appeal concerning his conviction of operating a motor vehicle while under the influence of intoxicating liquor.

[3] The defendant's text messages were mostly written in Haitian-Creole. We quote from the English translation included in the record appendix. All quotations are verbatim except where indicated.

On June 18, 2020, the defendant texted the wife again, asking whether she had "file[d] the taxes yet" and stating, "What's up, what did you say to the Police . . . you actually got me jailed."  On July 8, 2020, the defendant sent the wife several text messages in which he stated, "You have my tax money??  Fuck You . . . give me my fucking tax money."  He also sent her several photographs of his damaged car.

On August 19 and 20, 2020, the defendant sent the wife numerous text messages over the course of twenty-two hours.  In messages sent on the night of August 19, the defendant told the wife not to report him to the police and referred several times to "taking back" "[his] money" and "[his] $2900," which he said the Internal Revenue Service (IRS) had given to him.  He also called the wife seven times that night and in the early morning hours of August 20.  After receiving no response, the defendant texted the wife the following message at 8:43 A.M. on August 20:

> "Please you don't need to call IRS And you don't need to call the police to complain about me . . . they will give us each $2900 for the corona virus . . . I will send you the divorce papers on March 2021 . . . that's the date I've decided to do it . . . if I do it now you won't get the thing . . . because we had suffered a lot together I'll let you have it . . . you're lucky . . . Tell the court people you want to drop the complaint please . . . PUA each will get $2900 Don't call IRS I [illegible] the thing already . . . it's ok, I made them give us each $2900."
>
> "Please don't tell the people at the court if I texted you . . . they will put me in jail if I text you."

5

The defendant continued to text the wife throughout the day, apologizing about the damage to her car, offering to buy her a new one or pay the bill, asking her to call him, and telling her, "You don't need to be afraid of me."

On August 22, 2020, after still receiving no response from the wife, the defendant sent her a text message stating, "The people at the court are going to dismiss the case because they know I am not a criminal" and "I'll send you the divorce (documents) on Monday morning." He also sent photographs of what appeared to be divorce papers. The defendant then texted that he was "taking back the $2900" and stated, "You don't need to complain to the police about me . . . the court understands what's going on."

Discussion. 1. Witness intimidation. The witness intimidation statute, G. L. c. 268, § 13B (b), provides, in part, that "[w]hoever willfully, either directly or indirectly: (i) threatens, attempts or causes physical, emotional or economic injury or property damage to; (ii) conveys a gift, offer or promise of anything of value to; or (iii) misleads, intimidates or harasses another person who is a . . . witness or potential witness [in a criminal proceeding] . . . shall be punished." At trial the Commonwealth advanced the theory that the defendant's 8:43 A.M. text message on August 20 conveyed an

6

offer or promise of something of value to the wife and that he sent the message with the intent to influence the pending criminal proceeding. The defendant argues that the evidence was insufficient to support this theory. We disagree.

Viewing the evidence in the light most favorable to the Commonwealth, reasonable jurors could have found that the defendant intended his text message to convey to the wife that the IRS would "give [them] each $2900 for the corona virus" if he waited to "send . . . the divorce papers on March 2021." Reasonable jurors could have further construed the statements -- "that's the date I've decided to do it . . . if I do it now you won't get the thing . . . because we had suffered a lot together I'll let you have it . . . you're lucky . . . Tell the court people you want to drop the complaint please" -- to be an offer or promise to the wife that, if she dropped the complaint, the defendant would wait to file for divorce, thereby allowing her to keep the $2900 that he previously demanded she give to him. Although the text message is somewhat disjointed, the defendant confirmed that this was his meaning when he testified that he planned to let the wife keep the money she already received and ask the IRS to "reissue another check" to him, and agreed on cross-examination that he was proposing in his text message to "call[] the IRS, and . . . get [the wife] $2,900" and to wait to

7

file for divorce until after the IRS issued the additional check.[4]  The totality of this evidence was sufficient to show that the defendant was guilty of witness intimidation because he offered or promised the wife something of value if she did not cooperate in the criminal proceeding.  See Commonwealth v. Bellard, 494 Mass. 446, 448 (2024) (witness intimidation statute "prohibits the offer of a bribe to a witness or potential witness"); Commonwealth v. Cruz, 442 Mass. 299, 309 (2004) (essential element of witness intimidation "is the offer of a bribe or the use of intimidation, force, or the threat of force").[5]

This case is unlike Bellard, on which the defendant relies. There, the Commonwealth argued that the defendant promised something of value to his fiancée when he told her that, if she did not testify at his trial, (1) "their lives would return to normal" and "they could continue their relationship," and (2) the Department of Children and Families (DCF) would likely

---

[4] Because the defendant did not move for a required finding of not guilty on the witness intimidation count of which he was convicted, we consider "the evidence during the entire trial" in assessing his sufficiency challenge.  Commonwealth v. Dustin, 476 Mass. 1003, 1004 (2016).

[5] Given our conclusion in this regard, we need not address the Commonwealth's alternative argument that there was sufficient evidence to prove that the defendant intimidated or harassed the wife.

8

end its investigation into the fiancée's parental fitness. Bellard, 494 Mass. at 449.  The court rejected both arguments, concluding that the defendant's "expression of a vague interest in continuing his relationship with the fiancée" was "too amorphous to constitute a promise," id. at 450, and that the defendant had no "conceivable ability to deliver" on the second promise because he "never had, nor could he reasonably have been expected to have, power to terminate the DCF investigation or even to make that sought-after outcome marginally more likely to occur."  Id. at 453.

Here, by contrast, the defendant promised to give the wife money in exchange for her noncooperation in the prosecution. Unlike the "expression of a vague interest" in maintaining a personal relationship, money is an identifiable thing of value. Bellard, 494 Mass. at 449.  In addition, the defendant had the ability to deliver on his promise, as it was within his control to let the wife keep the $2900 that he had previously insisted was his money and demanded that she return.  On these facts we see nothing in Bellard that warrants overturning the conviction.

We are also unpersuaded by the defendant's argument that the Commonwealth failed to prove that he specifically intended to influence the wife's participation in the criminal proceeding.  The jury could have found the requisite intent

9

based on the statement, "Tell the court people you want to drop the complaint please," which was interposed between references to getting "[them] each $2,900." The defendant's testimony, as described above, supported such a finding. Furthermore, when the wife did not respond to the text message or the defendant's requests to call him, the defendant sent additional messages stating that the court would "dismiss the case" because he was "not a criminal," that he would send the wife the divorce papers on Monday morning, and that he was "taking back the $2900." These messages further supported the inference that the defendant's earlier promise to let the wife keep the $2,900 was contingent on her dismissing the complaint. Based on this evidence, the jury could have found that the defendant acted with the specific intent of interfering with the criminal proceeding. See Commonwealth v. Rosario, 83 Mass. App. Ct. 640, 645 (2013) (evidence sufficient to show specific intent where "conduct at issue reasonably could be viewed as an attempt to interfere with a witness's testimony").

2. Violation of abuse prevention order. The defendant challenges his convictions of violating an abuse prevention order on the ground that the Commonwealth offered insufficient evidence of the validity of the order. Specifically, the defendant argues that the Commonwealth failed to prove that he

10

received notice of the February 14, 2020 hearing to extend the ex parte order and that, without such notice, the extended order is "void."  We disagree for two reasons.

First, viewed in the light most favorable to the Commonwealth, the evidence established that the defendant had actual or constructive notice of the ex parte order and the date of the extension hearing.  As shown on the face of the ex parte order, a District Court judge authorized law enforcement to effect service on the defendant by cell phone if service by hand was not possible.  A Randolph police lieutenant testified that, because of the emerging COVID-19 pandemic and because the defendant appeared to live in Brockton, Randolph police decided to serve the ex parte order by cell phone.  Accordingly, on February 4, 2020, a Randolph police sergeant called the defendant's cell phone and left a voicemail message notifying the defendant "that he has a restraining order," of "the various points of the restraining order," and that he needed to contact the Randolph police for a copy of the order.  The next day, a different officer (who had passed away by the time of trial) called the defendant's cell phone and left a second voicemail message advising him of the order.  The defendant's cell phone records showed that he called the Randolph police station on February 12, 2020, raising an inference that he received the

11

voicemails.  This evidence was sufficient to show that the defendant had notice of the ex parte order and its "various points," which included the date of the extension hearing.  See Commonwealth v. Delaney, 425 Mass. 587, 591 n.7 (1997) ("The adequacy of notice so far as due process is concerned is dependent on whether the form of notice is reasonably calculated to give . . . actual notice of the proceedings and an opportunity to be heard" [quotations and citations omitted]).  At a minimum the evidence was sufficient to show that the defendant was on inquiry notice, which is sufficient to satisfy due process because "notice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would develop."  Id. at 592, quoting Commonwealth v. Olivo, 369 Mass. 62, 69 (1975).

Second, even assuming that the defendant did not receive notice of the hearing, that would not in itself require reversal of his convictions.  As we held in Commonwealth v. Watson, 94 Mass. App. Ct. 244, 252 (2018), even where a defendant was not given notice and an opportunity to be heard prior to the issuance of an abuse prevention order, a conviction of violating that order "is valid as long as the defendant received actual notice of the order prior to the alleged violation."  Due

12

process is satisfied in this situation because the defendant "ha[s] the opportunity to seek to have the order vacated." Id.

Here, the Commonwealth met its burden of proving that the defendant had actual notice of the extended order at the time of the violations. The jury convicted the defendant of violating the order on March 18,[6] June 18, July 8, August 20, and August 22, 2020. Prior to the violation on March 18, the defendant admitted to Trooper Doherty that he knew that the wife had "an open restraining order" against him. Trooper Doherty also told the defendant that it would be a violation of the order were Trooper Doherty to relay an apology to the wife on the defendant's behalf. Based on Trooper Doherty's testimony, the jury could have found that the defendant knew about the order when he sent the wife multiple text messages later on March 18 and on the subsequent dates. Moreover, on August 20, the defendant acknowledged that he was aware of the order when he texted the wife, "Please don't tell the people at the court if I texted you . . . they will put me in jail if I text you." Because the evidence thus showed that the defendant had notice of the order when he violated it, any lack of notice of the

---

[6] The defendant was charged with committing two violations on March 18. The jury convicted the defendant of one charge (electronic message) but acquitted him of the other (verbal communication or contact).

13

hearing does not warrant setting aside his convictions.  See
Watson, 94 Mass. App. Ct. at 252.

    3.  Assault and battery by means of a dangerous weapon.
The defendant next argues that all three convictions of assault
and battery by means of a dangerous weapon must be reversed
because the Commonwealth failed to prove that he "touched" the
wife with the dangerous weapon, namely, his car.  To sustain
these convictions, the Commonwealth had to prove, among other
elements, that "there [was] a touching, however slight," and
that "that touching [was] by means of the weapon."  Commonwealth
v. Appleby, 380 Mass. 296, 308 (1980).  "[T]he 'touching may be
. . . indirect, as by setting in motion some force or
instrumentality' that causes the victim to be touched, such as
where a defendant . . . intentionally or recklessly drives his
vehicle into a vehicle occupied by the victim."  Commonwealth v.
Porro, 458 Mass. 526, 530 (2010), quoting Commonwealth v. Dixon,
34 Mass. App. Ct. 653, 654 (1993).

    The defendant contends that there was insufficient evidence
of an indirect touching because the wife had no injuries and did
not testify that she was touched by anything in the car or that
she was moved within her seat when the defendant struck her car
with his.  We disagree.  While the evidence was not
overwhelming, it was sufficient.  The jury could have found that

14

the defendant struck the wife's car while traveling at a high speed, up to fifty to sixty miles per hour. The defendant's car had "heavy" front-end damage, and there was steam or smoke coming from the hood. The jury could have inferred from this evidence that the defendant hit the wife's car with such force that she would have been touched, even if only "slight[ly]," by something in the car such as her seatbelt. Appleby, 380 Mass. at 308.

The defendant further contends that there was insufficient evidence that he touched the wife three times, as opposed to two. The wife testified, however, that the defendant hit her car "several times" and answered affirmatively to the questions, "Was it more than twice?" and "Was it more than three times?" This testimony was sufficient to sustain the three convictions. In arguing otherwise, the defendant suggests that we cannot consider the wife's testimony because the jury acquitted him of the fourth count of assault and battery by means of a dangerous weapon, showing that they "did not credit [the wife's] claim that she was touched 'more than three' times." But the jury could have discredited that claim while still crediting her testimony that she was touched "more than twice." See Commonwealth v. Fitzgerald, 376 Mass. 402, 411 (1978) (jury "may accept or reject, in whole or in part, the testimony presented

15

to them").  And to the extent the defendant is arguing that the verdicts are factually inconsistent, any factual inconsistency is not "a ground for setting aside a conviction" because "the evidence is sufficient to support [the] conviction[s] on the count[s] on which the guilty verdict[s] [were] reached" (quotations and citation omitted).  Commonwealth v. Miller, 486 Mass. 78, 94-95 (2020).

4.  Reckless operation of a motor vehicle.  The defendant challenges his conviction of reckless operation of a motor vehicle on the ground that the Commonwealth failed to prove the element of operation on "a public way."  Commonwealth v. Duffy, 62 Mass. App. Ct. 921, 921 (2004).  The defendant concedes that there was sufficient evidence that he drove on a public way after he left the State Police barracks but contends that, because no reckless driving occurred after that point, we are limited to considering what happened before he reached the barracks.  Assuming, without deciding, that this is correct, we still conclude that the evidence was sufficient to show that the defendant drove recklessly on a public way.  Viewed in the light most favorable to the Commonwealth, the evidence established that the defendant pursued the wife in his car at high speeds through the towns of Randolph, Canton, and Milton.  While on the phone with the 911 dispatcher, the wife stated that she passed

16

two colleges.  Where the defendant chased the wife in his car through three different towns, the jury could have reasonably inferred that at least part of that chase occurred on a public way.  See Commonwealth v. George, 406 Mass. 635, 637 (1990) (public way is "place[] to which members of the public have a right of access by motor vehicle or access as invitees or licensees by motor vehicle").

5.  Threatening to commit a crime.  After the defendant's trial concluded, the United States Supreme Court held in Counterman, 600 U.S. at 79, that, to convict a person of making a true threat, the State must prove that the person acted at least recklessly, meaning, that he was "aware that others could regard his statements as threatening violence and deliver[ed] them anyway" (quotations and citation omitted).  The jury instruction here, consistent with the law as it existed before Counterman, did not require the jury to find that the defendant was subjectively aware that others could view his statement as threatening violence.

Despite the omission, the Commonwealth contends that we should affirm the conviction because it can be ineluctably inferred that the defendant knew that the wife would view his statement, "Today is the last day for me to kill you," to be threatening violence.  While this argument is not without force,

in Commonwealth v. Cruz, 495 Mass. 110, 113-114 (2024), the Supreme Judicial Court concluded in similar circumstances that the omitted Counterman instruction required vacatur of the defendant's conviction. The court so concluded without discussing whether the statement in question, "I'll punch you in your fucking face," gave rise to an ineluctable inference that the defendant acted with the necessary mens rea. Id. at 112. Thus, we believe we are constrained under Cruz to vacate the defendant's conviction.[7]

---

[7] We see no merit to the defendant's argument that there was a variance between the indictment and the proof at trial. The indictment was read at the start of trial; the Commonwealth's closing argument made clear that the alleged threat was the defendant's March 18, 2020 statement that it was the last day for him to "kill" the wife; and there was no evidence of any other statement that could be construed as a threat to injure the wife. Thus, as there is no "substantial risk that the defendant was convicted of a crime for which he was not indicted," Commonwealth v. Barbosa, 421 Mass. 547, 554 (1995), the Commonwealth can retry the defendant if it so chooses. See Cruz, 495 Mass. at 117.

Conclusion.  The judgment of conviction of threatening to commit a crime is vacated, and the verdict is set aside.  The remaining judgments are affirmed.

So ordered.

By the Court (Neyman, Shin & Wood, JJ.[8]),

*Paul Little*

Clerk

Entered: April 18, 2025.

---

[8] The panelists are listed in order of seniority.